Estate of Owen Jones.    Appeal of T. Pantall, Guardian
of Owen Jones, a minor.

*Guardian and ward— Surcharge—Profits.*

A guardian who procures another to purchase land at a partition sale of an estate in which his ward has an interest, furnishes the purchaser with the purchase money, takes a deed from the purchaser to himself, and then resells it at a profit, must account to his ward for the profit.

Argued Oct. 7, 1896.  Appeal, No. 130, Oct. T., 1896, by T. Pantall, guardian, from decree of O. C. Jefferson Co., Dec. T., 1890, No. 3, overruling exceptions to auditor's report.  Before .STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and. FELL. JJ.   Affirmed.

Exceptions to auditor's report.

The auditor, W. W. Winslow, Esq., reported the facts to be as follows :

E. L. Jones, of Youngs township, Jefferson county, died intestate, on or about the 9th day of March, 1879, leaving a wife and ten children, some of whom were of age and some minors ; .and being seized of three tracts of land in Youngs township, Jefferson county, (1) one of about sixty-four acres, (2) one of about ninety-five acres, and (3) one of about twelve acres, all of which were believed to be coal land, and subsequently became valuable.   Theodore Morris was appointed administrator of the Jones estate, and on January 9, 1892, by leave of court, he sold twenty acres off the sixty-four acre piece for the payment of debts.  This was bought by David Jones, one of the heirs, for the consideration of $1,227.

On December 12, 1881, David Jones, just mentioned, who was the eldest son of E. L. Jones, deceased, presented his petition to this court asking for partition of the real estate.   Partition was awarded and the usual course of procedure followed. An inquisition on the 30th of December, 1881, fixed the value of the land at $50.00 an acre for the first forty-four acres ; $54.00 an acre for the second ninety-five acres ; and $40.00 an acre for the third twelve acres,—in all about $7,840.  Service of the rule

to accept or refuse was made on the heirs, service being accepted for four of the minor heirs, among whom were Owen and Joseph Jones, by T. Pantall, guardian, on March 29, 1882, who had been appointed guardian on February 16, 1882, on petition of their mother, Anna E. Jones, and who filed his bond April 5, 1882. None of the heirs having elected to take the land at the appraisement, this court on May 11, 1882, ordered the administrator to sell the same at public sale.

Theodore Morris, administrator, reported to September term, 1882, of this court, that he had sold all the three pieces of land to David Jones for $7,590.94, being $50.00 an acre for one hundred and fifty-one and eight tenths acres. The land had been put up at public auction, and David Jones had been the highest bidder. This was on September 14, 1882. On the same day Anna E. Jones released her dower in the lands to David Jones for a consideration of $1,000. The sale by administrator was confirmed, and he was authorized to make deed. The deed from the administrator to David Jones was executed on September 15, 1882. On the same date David Jones made a deed to T. Pantall for one hundred and eighty-five and six tenths acres at a consideration of $9,749, this deed embracing one tract of 70 a. 73 p., apparently the sixty-four acre piece described in petition for partition, and another tract of 115 a. 29 p., all apparently being the land conveyed him by T. Morris, administrator, including the twenty acres sold for payment of debts. There seems to have been a considerable gain in acreage over that stated in the petition for partition.

On October 13, 1882, T. Pantall sold the "coal and coal rights" in this same land conveyed to him by D. Jones—including also 6 a. 127 p. deeded by said D. Jones to said T. Pantall by another conveyance, also dated September 15, 1882, consideration $334,—to the R. & P. Coal and Iron Company, for a consideration of $10,105, being very nearly the same amount paid by said T. Pantall for the said land, but leaving him still the owner of the surface. On the same date Mr. Pantall sold to the R. & P. Coal and Iron Co. fifty acres, being part of the surface of land bought from David Jones, September 15, 1883. For this surface Mr. Pantall received a consideration of $1,500. In September, 1883, T. Pantall sold to J. R. Pantall sixty-eight acres more of this surface, for a consideration of $1,500. What

was done with the remainder of the surface—about sixty-seven acres—has not been brought to the auditor's attention.

The administrator filed his account to this court to No. 14, December term, 1882, showing that out of the proceeds of the sale in partition he had paid over to T. Pantall, guardian, $733.86 for each of the four heirs for whom he was guardian. This money, together with $45.79 received by the guardian from the administrator March 24, 1883, has been in his hands since that time. It was deposited by him in the Tradesmen's National Bank of Pittsburg, at three per cent interest, that being the best rate obtainable for safe investment, it seems. On October 10, 1882, the interest thereon was allowed by this court to Anna E. Jones for the maintenance of the children, she being E. L. Jones's widow. (She was afterwards intermarried with John Carey.) Some time during the next few years, Mrs. Jones made one or more loans from T. Pantall, one of which was entered to No. 178 May term, 1885, amounting to $630, with interest from February 16, 1884, and costs. March 29, 1890, a præcipe for sci. fa. to revive this judgment was filed to No. 207, May term, 1890, to which Anna E. Carey made an affidavit of defense, claiming substantial reductions in the amount of the debt, and referring to a certain article of agreement between her and Pantall, bearing date July 27, 1885. She also alleged that she had received no payment of the interest allowed her by the orphans' court since March 14, 1885. The article of agreement referred to is hereto attached (marked exhibit " J "), and stipulates, among other things, that, inasmuch as Pantall was receiving but three per cent interest for the wards' money, he should charge the widow but three per cent for her loan. The affidavit of defense to No. 207, May term, 1890, alleges violation of this agreement on Mr. Pantall's part.

On October 15, 1890, T. Pantall filed his final accounts as guardian of Owen Jones and Joseph Jones, showing the receipt of the $733.86 from administrator Morris out of the sale of real estate, and $45.79 from the administrator arising from other sources. He charges himself with interest on the latter sum from September 24, 1883, but charges himself with no interest on the larger amount, $733.86, stating that the same had been settled with Mrs. Jones under the allowance of the orphans' court for maintenance. He claims credit for the

amount of several vouchers, and also claims $73.38 for "services of guardian in selling and collecting money in sale of real estate," and $65 for "services of guardian in managing said, estate," and $25 for "services, time and annoyance in filing this account."

To this final account Mrs. Anna E. Carey, the mother, filed the exceptions hereto attached, alleging substantially as follows : (1) that the guardian and David Jones entered into a fraudulent scheme to prevent the real estate selling for its real market value, and that having succeeded in getting the land sold to David Jones for several thousand dollars less than its market value, Jones immediately turning it back to Pantall, who sold to the coal company and others at a large advance, the guardian should be charged with the one tenth amount of the total loss sustained by the transaction, for each of said heirs ; (2) that the guardian misstated the facts when he claimed to have settled the interest with Mrs. Carey, which he had not done ; and that he had violated the terms of the article of agreement of July 27, 1885, (exhibit " J ") ; (3) that Mr. Truitt's attorney fee was improper ; (4) that the other attorney fees were improper ; (5) that the guardian had done nothing in making the sale of real estate, hence had no right to the ten per cent commission ; (6) that the charge for managing the estate was unreasonable and excessive ; (7) that the charge for services, time and annoyance was illegal and unjust.

One additional exception was filed to the account as guardian of Joseph Jones, bearing upon the sufficiency of the affidavit thereto, but the auditor thinks this exception of no consequence. It is therefore dismissed.

Great stress was laid upon exceptions 1, 2 and 5, in the testimony. The exceptant claimed and attempted to prove that T. Pantall was agent for the R. & P. Coal and Iron Co., which corporation began to buy coal land north of Punxsutawney in the summer of 1881, that the E. L. Jones tract was directly in the line of their purchases, was known to contain coal, that already openings had been made on it, and that the land was of especial value ; that Mr. Pantall, being the active agent in effecting the sales stood in such relation to the coal company that he could in a measure control their purchases ; that his motive in securing the guardianship of the four minor heirs

was more effectually to manipulate the sale to the coal company, it being a matter of common knowledge that the chief value of the land grew out of the coal company's prospective operations; that Mr. Pantall, standing in the relation that he did, possessing the information and the power that he did, set up a fraudulent scheme with David Jones, one of the heirs, to get this valuable property at a low figure, and then dispose of it to the company at a large advance—this to the great detriment of the heirs,—and that securing the guardianship was one step in the scheme.

If this claim were fully substantiated by the evidence, it would show forth a most iniquitous state of affairs—one demanding that the auditor should visit upon the guardian the severest penalty within his power; but hesitancy to charge upon any man or men so gross a fraud, except the evidence be conclusive and beyond reasonable doubt, is both natural and in accordance with legal rules. The auditor cannot conscientiously find the facts set up as existing by the exceptant, though he admits that there are elements in the transaction that are not what could always be desired in such cases; steps were undoubtedly taken which a delicate sense of the proprieties belonging to the position of the parties would forbid. Indeed the facts as shown by the evidence are such as bring the transaction within the rule of law that forbids anything like speculating, however innocently, upon the property of a cestui que trust for the personal gain of the trustee. But the conclusion that fraud of so unholy a character as is alleged was planned and executed by Pantall and Jones, should be predicated only of a state of facts that admits of no other reasonable explanation.

It is proved to the satisfaction of the auditor, and he so finds, that the E. L. Jones' land became marketable before Mr. Pantall became guardian, or before he was requested to act in that capacity; that Mr. Pantall stood in the position of a buyer of coal land for the Walston Company, though perhaps not strictly their agent; that Pantall knew more of the probable intentions. of the coal company as to where purchases should be made and what price paid, than any other man not an official or stockholder in the company; that Pantall knew that the land was of considerable value to the company, and that they would possibly pay more for it than the appraisement price, and that he

knew this before and at the time he was appointed guardian; that he accepted the guardianship knowing that David Jones had instituted proceedings in partition looking toward a sale of the land; that Pantall knew, and everybody else who had had any interest in the matter knew, that the land would be sold to the coal company if to anybody; that Pantall did everything he could to facilitate the sale in partition; that Mrs. Jones, the widow, at the suggestion of her son, David Jones, had Pantall appointed guardian, and that that was done for the main purpose of getting the sale through; that David Jones had information from some source that he could dispose of the property to the coal company as soon as it was knocked down to him at the partition sale, and that he would lose nothing by the transaction; that Pantall made no effort to buy in the property at the sale, either for himself or for his wards; that David Jones never put a dollar into the purchase from the trustee in partition, but received from Mr. Pantall the purchase money, as consideration of a sale to Pantall on the very day the administrator made the deed to Jones, this being the day following the confirmation of the sale in partition; that men were present at the public sale in partition who were able and willing to buy in the land on a speculation, but who were deterred from bidding to a high price because they believed there was a deal between Pantall and Jones, and they (the would-be buyers) were not in it. All these facts the auditor finds to be true. What do they prove?

They do not, in the face of positive denials under oath by David Jones and T. Pantall, prove that there was a fraudulent bargain between these two men. They do not prove that T. Pantall instituted the partition proceedings, or engineered them through. There is a conflict of testimony between Pantall and Jones as to the offer of Pantall to furnish Jones money to buy in the property in case it was knocked down to him; but even if there was such an offer, it does not of itself prove fraud, as it is not incompatible with the theory that the guardian simply was seeking investment of his money, and knew the security would be good. Under the circumstances it would be indelicate, but not wicked, to make such an offer. Possibly Mr. Pantall made some suggestion of this kind; but he says emphatically that he did not. Mr. Jones says he did. The auditor suspends judgment on this disputed point.

In the absence of fraud or collusion, the guardian had a right to accept service of the notices in the partition proceedings; he had a right to attend the sale; he had a right to bid and he had a right not to bid; he had a right to let David Jones bid in the property at what seven good men and true had appraised it at. It was not incumbent on the guardian to bid in the property, for it would of necessity require more money than his wards would get out of it. If he at that time knew of a certainty, however, that the R. & P. Coal and Iron Company would pay for the land considerably more than it was knocked down for, it was his duty as guardian to make the property reach that figure. But we don't know that he did know at the time of the sale what the company would give. Mr. McGregor, whose recollection was poor, thinks Mr. Pantall said before the sale that he could find out what the company would give. Perhaps he did find out, but there is no direct evidence that he did. If he did, he acted badly. He knew the company would buy, for he told David Jones so, and he himself tried to buy from Jones after the public sale and before confirmation. Nearly three months elapsed between the sale and the confirmation, and there was time meanwhile for the guardian to learn a great many things that he was previously unaware of. Perhaps he learned what the company would pay. At all events, he seems to have learned that David Jones had a good thing; that there was money to be made in selling the land to the coal company, for which he had been buying land and coal before. So he stepped in and bought the land, on the very day Jones got his deed from the trustee in partition. The transactions were in the eyes of the law simultaneous.

Right here, T. Pantall, guardian, did what the law says he must not do; he entered into a speculative purchase of the estate of his wards; and no matter how innocently he acted, he made himself liable to those wards for every dollar of profit he made out of the transaction.

Grant that there was no deal between Jones and Pantall; grant that the latter did everything the law demanded of him as guardian of the person and estate of these heirs, up to this time; the rule is fixed in the law; public policy has prescribed it. The guardian could not become a purchaser, if he was thereby brought into opposition to his duty as guardian, in the

slightest degree. It is not a question of whether or not he was honest, whether or not there was fraud.

"If a trustee or other person standing in a fiduciary relation acquires property, or makes a profit, by means of transactions within the scope of his agency or authority, or if a person employs another's property in any trade or speculation, there will be a constructive trust as to the property so acquired, or the profits so made, for the benefit of the cestui que trust, principal owner, or other person standing in the opposite relation."

David Jones bought the land at partition sale, knowing that he could sell it to the R. & P. Coal and Iron Co. He bought it with that design. All sales made to the coal company were made through T. Pantall or under his direction. David Jones bought the land in and immediately sold it to Pantall. Mr. Pantall bought on a speculation. He sold at a handsome advance. David Jones is not involved in the matter now before the auditor except as a historical character, so it is not necessary to figure on his gains. Mr. Pantall's account as guardian is before the auditor, and his profits the law requires us to look into. The auditor is proceeding upon the theory that there was no such unrighteous scheme as is alleged, for it is not proved beyond reasonable doubt. But the unpleasant fact remains that the guardian took the property from David Jones at the moment Jones took it from the trustee in partition—indeed, almost before David Jones received it; for the same money was used in both transactions. David Jones may be wrong in saying that T. Pantall promised to advance him money to buy the land at the partition sale, which Pantall denies; but there does seem to have been an understanding between them at the time of confirmation of the sale, that Pantall was to get the land and pay the price; and possibly Jones has forgotten the exact nature of the bargain between them. There ought not to have been any bargain at all under the circumstances. The coal company ought to have bought the land through some other agent. Mr. Pantall, the guardian, and Mr. Pantall, the agent, ought not to have come so close together. The guardian should have held the agent at arm's length. How much did T. Pantall make in the transaction? Whatever he made should be shared among these heirs—one tenth to each,—and the guardian must of course pay interest on the sum until the day of settlement.

On this head all our information comes from the records. On September 15, 1882, David Jones sold to T. Pantall one hundred and eighty-five acres and one hundred and two perches for a consideration of $9,749.28; on the same day Jones sold the coal and coal right in another tract of 6 a. 127 p. to Pantall, for a consideration of $334. This makes in all $10,083.28 paid by T. Pantall for the land. A few weeks later he sold the coal and coal right in this same land to the R. & P. Coal and Iron Co. for $10,105. On the same date he sold fifty acres of the surface to the same company for $1,500, and a year later he sold sixty-eight acres of the same surface for 1,500. This shows a gain to Mr. Pantall of about $3,022. What, if anything, he realized out of the rest of the surface, was not shown to the auditor. It is currently reported that T. Pantall paid the widow $1,000 for a release of her dower interests in the land, but the records show that David Jones purchased the release of dower from his mother on the day of the confirmation of the sale, and one day before Pantall bought. It is more than likely that Pantall paid the money; but the records do not show this, and there is no other evidence on the subject before the auditor. The records show a profit of $3,022—four tenths of which, as has been said above, are properly going to the heirs for whom Pantall was guardian, or one tenth to each. The law seems to hold the guardian to this rigid rule only as to the portion of the estate belonging to his wards. He stood in no trust relation to the other heirs, but only as to Mollie, Lewis, Owen and Joseph.

The auditor finds that T. Pantall should account to Owen Jones, the ward whose portion is now under consideration, for the sum of $302.20, with interest on $152.20 of this sum from October 13, 1882, to September 7, 1891, the date of filing this report, and on $150 of the amount from September 7, 1883, to September 7, 1891. The guardian will be surcharged with this amount in the account for each of the heirs, Owen and Joseph Jones.

Exceptions to the auditor's report were dismissed by the court. MAYER, P. J., of the 25th judicial district, specially presiding.

*Errors assigned* were in dismissing exceptions to auditor's report.

*G. A. Jenks,* with him *G. W. Means* and *B. M. Clark,* for appellant.—The principle of law on which the auditor and the court ruled this case is inapplicable to the case. It is stated in the case which he relies upon, Shuman's Appeal, 27 Pa. 64, as follows : An executor or trustee who buys or procures another to buy for him at his own sale, holds the land on the same trusts that it was subject to before: Chorpenning's App., 32 Pa. 315; Prevost v. Gratz, Peters' C. C. Rep. 378; Fisk v. Sarber, 6 W. & S. 23; Hall's App., 40 Pa. 409; Lusk's App., 108 Pa. 152.

*Charles Corbett,* with him *W. M. Gillespie,* for appellee.—The finding of an auditor approved by the court below will be sustained on appeal, if there is any evidence which warrants it, and must stand unless clearly erroneous : Fessenden's Est., 170 Pa. 631; Lewis's App., 127 Pa. 127; Harbison's Est., 145 Pa. 456 ; Countryman's Est., 151 Pa. 577; Penn Bank's Est., 152 Pa. 65; Baird v. Ford, 152 Pa. 637 ; Huckestein & Co. v. Kaufman, 173 Pa. 199; Stevenson Co., Ltd., v. Sample, 174 Pa. 165.

The facts clearly bring the appellant within the rule which forbids a trustee to purchase at his own sale, or one made by his own procurement, or in any way to use his knowledge or manipulate to make gain to himself out of the estate or interest intrusted to him: Chorpenning's App., 32 Pa. 315; Beeson v. Beeson, 9 Pa. 279; Aultman's App., 98 Pa. 505; Parshall's App., 65 Pa. 224; Rosenberger's App., 26 Pa. 67; Hill v. Frazier, 22 Pa. 324.

PER CURIAM, January 4, 1897 :

If we treat the record in this case as sufficient to bring up for review all the matters complained of in the court below, and embraced in appellant's sixteen specifications, we are not convinced that there is any error that requires either reversal or modification of the decree ; nor do we think it would serve any useful purpose to consider the specifications in detail.

Appellant's final account as guardian having been filed, exceptions thereto were referred to an auditor before whom all parties appeared and were fully heard ; and a decree was finally made ordering appellant as late guardian to pay over to his suc-

cessor the sum found to be due the estate of his ward,—said sum to be held pending the adjustment and settlement of the widow's claim against the late guardian for the support and maintenance of said ward. The facts found by the learned auditor and approved by the orphans' court were fully warranted by the evidence, and should now be accepted as verity. Those facts clearly justified the entry of the decree surcharging appellant with all the profits made by him out of the land belonging to the minor's estate. It is no ground for reversal that the proceeds of a small tract of land not belonging to the estate of the minor may be included in the transaction. Appellant as guardian after mixing the funds has furnished no evidence by which they may be separated.

Decree affirmed and appeal dismissed at appellant's costs.